IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DILLINA HULL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-1553 |
| | § | |
| ANDREW SAUL,[1] COMMISSIONER | § | |
| OF THE SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 14) and Defendant's Cross-Motion for Summary Judgment (Doc. 13). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under

---

[1] Nancy Berryhill was the Acting Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Andrew Saul is now Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Doc. 10, Ord. Dated July 20, 2018.

Title II of the Social Security Act ("the Act").

## A. Medical History

Plaintiff was born on June 3, 1974, and was forty years old on the alleged disability onset date of November 27, 2014.[3] Plaintiff received special education services in school but graduated from high school and, after several attempts, passed the cosmetology examination after which she worked as a hairstylist.[4] Plaintiff also worked as a janitor at a school for ten months and student bus driver for more than five years.[5]

When Plaintiff was twenty years old, she was in a vehicle accident and suffered a head injury as a result of being thrown through the windshield.[6] During the ten years prior to Plaintiff's alleged onset date, she received treatment for dyslexia, depression, anxiety and vocational rehabilitation.[7] In 2007, Plaintiff admitted herself to psychiatric hospital "after losing her job and her home" and received outpatient therapy thereafter.[8]

On April 15, 2015, Audrey Muehe, Ph.D., ("Dr. Muehe"), a

---

[3]   See Tr. of the Admin. Proceedings ("Tr.") 94, 104, 184, 217.

[4]   See Tr. 78, 83, 222-23, 282-92.

[5]   See Tr. 78, 83, 218, 223, 239-44.

[6]   See Tr. 301.

[7]   See Tr. 225-27.

[8]   Tr. 301; see also Tr. 332.

clinical psychologist and neuropsychologist, interviewed Plaintiff and administered a battery of tests with the purpose of determining Plaintiff's then-current levels of academic achievement as part of an assessment for vocational rehabilitative services.[9]  Plaintiff identified her disability as illiteracy.[10]  Plaintiff reported a history of alcohol abuse but represented that she had been sober for six months at the time of the interview.[11]  Her only reported medications were BC Powder and vitamins.[12]

According to Dr. Muehe, Plaintiff appeared on time; "her general appearance reflected adequate hygiene and grooming skills[;]" her "[a]ffect and mood were irritable and angry[;]" and she cried at times during the testing.[13]  Dr. Muehe described Plaintiff's spontaneous speech as complaining in nature, particularly in relation to the testing, which was "almost discontinued" thrice due to Plaintiff's becoming so upset when asked to perform reading, writing, and math.[14]  A mental status examination was largely normal except that she had difficulty comprehending instructions and directives, she spoke with limited grammatical structure, and her attention and concentration were low

---

[9]     See Tr. 300-09.

[10]    See Tr. 301.

[11]    See id.

[12]    See id.

[13]    Id.

[14]    Id.

average.[15]

The test results revealed limitations in intellectual functioning; early elementary level reading, spelling, and mathematics; deficient graphesthesia on the right hand; low-average immediate auditory attention; and deficient rote learning, recall, ability to copy a complex geometric design, tracking, and ability to generate multiple hypotheses.[16]  From the interview and test results, Dr. Muehe drew the following functional limitations: (1) illiterate reading, writing, and spelling skills; (2) poor mathematical skills; (3) some problems with memory; (4) depression, anxiety, and irritable mood; (5) high number of detail errors; (6) limited comprehension of abstractions and directions and limited insight; (7) limited coping skills; (8) sporadic work history; and (9) difficulty understanding, remembering, and carrying out detailed instructions.[17]

Dr. Muehe diagnosed Plaintiff with major depression and opined that Plaintiff would "experience difficulty with learning and retention when information is presented orally and involves disparate parts and chronological events" but that she possibly could compensate for her memory deficits with the use of sticky

---

[15]    See Tr. 302.

[16]    See Tr. 302-04.

[17]    See Tr. 304-05.

4

notes, calendars, and lists.[18]  Dr. Muehe found Plaintiff's attention to simple tasks to be good but her illiteracy to be a "significant vocational handicap especially if she want[ed] to work in an office at a desk position."[19]

Dr. Muehe diagnosed Plaintiff with amnestic disorder and major depression and assessed Plaintiff's Global Assessment of Functioning ("GAF")[20] to be 50, a score at the higher-functioning end of the serious-symptoms category.[21]  Even so, Dr. Muehe found Plaintiff able to work:

> Her job potential is on where she would likely be able to operate simple equipment.  If given ample time and instruction, she would likely be able to learn a limited number of steps for routinized jobs.  If deviations or snags emerge, [Plaintiff] will likely need access to a supervisor for guidance and assistance in problem-solving.  She will likely require hands-on, experiential training, such as an apprentice training program.  She is unlikely to benefit from textbook or written manual learning at this time.[22]

Plaintiff received basic counseling and medication management at the Mental Health and Mental Retardation Authority ("MHMRA")[23]

---

[18]     See Tr. 305, 306.

[19]     Tr. 305.

[20]     The GAF score is a way for a mental health provider to subjectively estimate an individual's social, occupational, and psychological functioning.  See Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000)(replaced in 2013 by the fifth edition, which dropped GAF in favor of the World Health Organization Disability Assessment Schedule 2.0).

[21]     See Tr. 308-09.

[22]     Tr. 307.

[23]     MHMRA is now known as The Harris Center.

from August 17, 2016 through February 20, 2017.[24]  On August 17, 2016, Plaintiff reported a history of major depression and alcohol abuse but admitted that she had not received treatment for these issues in the prior eight years.[25]  She stated that she had lost about twenty-five pounds in the prior six weeks and described her energy level as "up and down, I[']m cleaning, I[']m dancing, I[']m talking to my friends[;] [b]ut once I get home by myself it goes down."[26]

Plaintiff failed to attend an appointment on September 9, 2016.[27]  Plaintiff called the MHMRA helpline in late October because she was out of medications and explained that she had missed the intake appointment because she did not have a ride.[28]  Plaintiff expressed concern that she would not be able to arrange transportation to the next scheduled appointment, and MHMRA scheduled a home visit.[29]  When MHMRA contacted Plaintiff by telephone on November 1, 2016, Plaintiff reported that she had been out of medication since September and did not know about the missed appointment.[30]

---

[24]   See Tr. 323-61.

[25]   See Tr. 332.

[26]   Id.

[27]   See Tr. 358.

[28]   See Tr. 359.

[29]   See id.

[30]   See Tr. 358.

On November 3, 2016, Vasanthi Janarthanan, M.D., ("Dr. Janarthanan") saw Plaintiff for a psychiatric assessment.[31] Plaintiff reported a history of "depressed mood, crying spells, [h]elpless, hopeless and worthless feelings, . . . headaches, [d]eclining self care, increased anxiety and worrying, erratic sleep, poor appetite, isolating self, [l]ack of concentration, [l]ack of motivation, lack of energy and stay[ing] in bed mostly."[32] Plaintiff denied experiencing hallucinations, delusions, and suicidal/homicidal ideation.[33] Plaintiff also reported that she had been abusing alcohol for the prior three months with her most recent use "a couple days" earlier when she consumed four bottles of wine.[34]

Dr. Janarthanan recorded that Plaintiff was casually dressed, cooperative and that she exhibited normal motor activity, soft spoken speech, spontaneous language, depressed and anxious mood, constricted affect, logical thought processes, goal direct associations, alert sensorium, and grossly intact cognition.[35] Plaintiff denied hallucinations, delusions, suicidal ideation, and homicidal ideation.[36] Plaintiff was oriented to person, place,

---

[31]   See Tr. 332-39.

[32]   Tr. 332.

[33]   See id.

[34]   Id.

[35]   See Tr. 334.

[36]   See id.

time, and situation, according to the doctor, but exhibited deficits in immediate, recent, and remote memory with selective attention.[37] Dr. Jaranthanan found Plaintiff's fund of knowledge to be appropriate for her age and educational level but found her insight and judgment to be limited.[38] He diagnosed Plaintiff with major depressive disorder and alcohol abuse and assessed a fair prognosis.[39] Dr. Janarthanan prescribed trazodone, a medication that treats depression, anxiety, and insomnia.[40]

In addition to seeing Dr. Janarthanan on November 3, 2016, Plaintiff also attended an appointment for medication training and support and a counseling assessment.[41] At the medication appointment, a mental status examination was normal except for limited judgment and insight and illogical thought process.[42] At the counseling assessment, Plaintiff and the therapist developed a treatment plan.[43] One of the goals they set was to decrease the use of alcohol and to cease the use of illicit drugs.[44]

Plaintiff failed to attend a follow-up appointment on December

---

[37] See Tr. 335.

[38] See id.

[39] See Tr. 335, 338.

[40] See Tr. 331.

[41] See Tr. 340-46.

[42] See Tr. 356.

[43] See id.

[44] See Tr. 343.

1, 2016.[45]  On December 2, 2016, Plaintiff reported "increased anxiety[,] crying sp[e]lls, helpless[ness], hopeless[ness], worthless[ness], and declin[ing] self care, lack of motivation, and concentration."[46]  However, at a session for skills training and development on the same day, Plaintiff reported that she was feeling more positive about herself and her abilities.[47]  Plaintiff indicated that she was still using alcohol, stating, "When I drink the whole box of wine, my brain stops and I can go to sleep."[48]  A mental status examination was normal except for depressed mood and limited judgment and insight.[49]

About a week later, Plaintiff attended an appointment for medication training and support and reported that she "ha[d] been crying at times, pacing around and having sleeping issues."[50]  The mental-health provider noted that Plaintiff was well groomed and noted a normal mental status examination with fair judgment and insight.[51]  At that appointment, Plaintiff stated that she was interested in beginning therapy services as recommended.[52]

---

[45]     See Tr. 330.

[46]     Tr. 325, 352.

[47]     See Tr. 352.

[48]     Tr. 353.

[49]     See Tr. 353.

[50]     Tr. 349.

[51]     See Tr. 350.

[52]     See id.

On December 12, 2016, Plaintiff was not at home when the therapist arrived for scheduled psychotherapy.[53] On December 19, 2016, MHMRA telephoned Plaintiff to schedule an appointment and left a voice message.[54]

On December 30, 2016, an MHMRA psychotherapist provided an extended in-home session of cognitive behavioral therapy "due to severity of symptoms and stressors."[55] The therapist also provided skills training and development.[56] Plaintiff's mental status examination returned results within normal limits.[57] Plaintiff identified sleep issues, restlessness, low motivation, dizziness, and paranoia as medication side effects and articulated an understanding of the importance of taking her medications daily.[58]

On January 24, 2017, Plaintiff again failed to appear for a medication management appointment.[59] On February 1, 2019, Plaintiff's therapist received a rambling text from Plaintiff in which she expressed fear of the doctors and nurses and complained

---

[53] See Tr. 361.

[54] See Tr. 360.

[55] Tr. 51.

[56] See Tr. 53-54.

[57] See Tr. 54; but see Tr. 51 (describing Plaintiff's mood as mildly depressed.

[58] See Tr. 54.

[59] See Tr. 36.

about the side effects of her medication.[60]   In a staffing of Plaintiff's case, the therapist reported that Plaintiff had made contact via cell or text on numerous occasions.[61]   The therapist described the contacts as "confusing and erratic."[62]   The staff discussed options to best work with Plaintiff and addressed Plaintiff's issues with appointment attendance and with medication compliance.[63]

A few days later, Plaintiff's case was staffed with Dr. Janarthanan.[64]   The note from that staffing stated that Plaintiff "displayed disorganized thinking, loose associations, and irritability" in her contacts with the therapist and that Plaintiff continued to use alcohol.[65]

On February 14, 2017, Plaintiff sent the therapist another bizarre text.[66]  When the therapist telephoned Plaintiff about the message, Plaintiff advised that she felt intimidated by the therapist because she had contacted Plaintiff on an office line, and then Plaintiff disconnected the line.[67]   Plaintiff immediately

---

[60]     See Tr. 48.

[61]     See Tr. 49.

[62]     See id.

[63]     See id.

[64]     See Tr. 47.

[65]     Id.

[66]     See Tr. 42.

[67]     See Tr. 43.

returned the call to the therapist to "fire" her and disconnected the line again.[68]  The therapist then contacted Plaintiff's mother who advised that Plaintiff was intoxicated.[69]  The therapist advised Plaintiff's mother of issues with drinking and taking medication.[70]

On February 20, 2017, Plaintiff appeared for medication management and reported that she had ceased all of her medications one month earlier.[71]  Plaintiff endorsed paranoia, depressed mood, occasional crying spells, occasional helpless, hopeless, and worthless feelings, increased anxiety, worrying, erratic sleep, poor appetite, isolating self, lack of concentration, erratic energy, and fair motivations.[72]  Dr. Jaranthanan noted mild depression and psychotic symptoms, as well as poor medication compliance.[73]  Plaintiff tested positive for alcohol and cannabis.[74]

According to Dr. Jaranthanan's note, Plaintiff's mood was anxious and dysthymic and her insight and judgment were limited, but other results from examination were normal.[75]  He also made the following assessment of Plaintiff's functional status:

---

[68]    See Tr. 44.

[69]    See Tr. 45.

[70]    See id.

[71]    See Tr. 30.

[72]    See id.

[73]    See id.

[74]    See Tr. 30, 33.

[75]    See Tr. 30-32.

Able to do ADLs [activities of daily living]
        Has social skills
        Takes care of her grandchildren[.][76]

As problem areas, the doctor listed mild depressive symptoms,

psychotic symptoms, and substance abuse.[77]  He prescribed Prozac for

depression, Risperdal for psychotic symptoms, and Benadryl for

sleep.[78]

        On the same day, Plaintiff attended a psychotherapy session.[79]

Plaintiff provided feedback on the session: "Very good therapy[.]

The first thing that I am going to do is pour out the wine/beer."[80]

## B.  <u>Application to SSA</u>

        On August 24, 2015, Plaintiff applied for disability insurance

benefits claiming an inability to work since November 27, 2014, due

to "[a]mnestic [d]isorder, [r]ecurrent [m]ajor [d]epression,

[r]eading [d]isorder, [d]isorder of [w]ritten [e]xpression, and

[m]athematics [d]isorder."[81]  In a disability report dated August

25, 2015, Plaintiff stated that she was diagnosed with dyslexia

while in middle school.[82]  In a function report completed about the

_____

        [76]    Tr. 32.

        [77]    <u>See</u> Tr. 33.

        [78]    <u>See</u> <u>id.</u>

        [79]    <u>See</u> Tr. 40-41.

        [80]    Tr. 41.

        [81]    Tr. 221; <u>see also</u> Tr. 94, 104, 184-85, 217.  The application summary
sets the date of filing as August 25, 2015.  <u>See</u> Tr. 184.

        [82]    <u>See</u> Tr. 227.

                                13

same time, Plaintiff stated:

> With my dyslexia, I can't read.  I can't fill out
> paperwork[.] When I try to read big words, my mind goes
> blank.  When I try to ask for accommodations[,] people
> just look at me like I am [n]ormal & don't help me.  I
> don[']t have computer skills, I can[']t remember [n]ew
> information.  I am also severely depressed & can[']t get
> out of bed.[83]

Plaintiff recorded her activities on a typical day: "I first pray
when I wake up, general hygiene, watch [television] for news,
weather, get dressed, call people, eat my meal[,] call for
resour[c]es, take care of grandkids — (some) cook food."[84]

Plaintiff reported no difficulty with personal care and no
need for special reminders to take care of her personal needs, to
take medication, or to perform housework.[85]  Although Plaintiff
stated that she could not complete paperwork, remember, or
comprehend, she indicated that she could pay bills, count change,
use a checkbook/money orders.[86]  Plaintiff also reported preparing
meals for herself and her family on a daily basis and cleaning for
thirty minutes twice a week.[87]  She said that she went outside five
days a week and was able to go out alone, shop in grocery and
thrift stores, drive a car, and travel by foot.[88]

---

[83]     Tr. 229.

[84]     Tr. 230.

[85]     See Tr. 231.

[86]     See Tr. 230, 232.

[87]     See Tr. 231.

[88]     See Tr. 232.

According to the report, Plaintiff's hobbies included watching television and engaging in craft activities with her grandchildren and her social activities included talking on the telephone once a day, and going to church twice a week.[89]  Plaintiff said that, at church, she served as an usher, but could not read the hymns or the Bible.[90]

Concerning her interactions with others, Plaintiff reported that she experienced problems getting along with others, particularly when others took advantage of her or did not understand her disabilities and become frustrated with her.[91]  She identified memory, completing tasks, concentrating, understanding, and following instructions as tasks affected by her impairments.[92] She further explained that she had difficulty comprehending and remembering what was told to her; that she could not learn; that she had trouble following through with activities; and that she could not remember or carry out instructions that had more than one step.[93]  Plaintiff reported being able to get along with authority figures unless they took advantage of her but had difficulty handling stress and changes in routine.[94]

---

[89]     See Tr. 233.

[90]     See id.

[91]     See Tr. 234.

[92]     See id.

[93]     See id.

[94]     See Tr. 235.

On September 30, 2015, the SSA found Plaintiff not disabled at the initial level of review.[95]  The medical consultant reviewing Plaintiff's record determined that she suffered from a learning disorder and an affective disorder and considered corresponding mental impairments described in the regulations as presumptively disabling ("Listings"),[96] specifically Listing 12.02 for organic mental disorders and Listing 12.04 for depressive, bipolar, and related disorders.[97]  Finding that Plaintiff's impairments neither met nor equaled either Listing, the medical consultant evaluated Plaintiff's residual functional capacity ("RFC") and opined that Plaintiff was markedly limited in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions and moderately limited in her ability to respond appropriately to changes in the work setting but that she was not significantly limited in any other category of mental limitations.[98]  The reviewer concluded that Plaintiff was "able to understand, remember and carry out simple instructions, make simple decisions, interact [with] others, concentrate for extended periods, and respond to changes" and, thus, was not disabled.[99]

---

[95]     See Tr. 94-103, 115-19.

[96]     See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[97]     See Tr. 96-98.

[98]     See Tr. 97-100.

[99]     Tr. 100; see also Tr. 102.

On October 21, 2015, Plaintiff requested reconsideration of the initial decision and, the following day, provided information about changes in her condition since the last report.[100]  The update simply stated that her "dyslexia, memory and cognitive impairments, anxiety, depression, [high blood pressure] and panic attacks [were] worse."[101]  Two months after Plaintiff's request for reconsideration, the SSA again found Plaintiff not disabled.[102]  A different medical consultant reviewed Plaintiff's file, as well as additional treatment records, but ultimately concurred with the prior assessment, stating:

> The [claimant] is somewhat limited by [symptoms], but the impact of these [symptoms] does not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis.  Functional limitations are less than marked.  The alleged severity and limiting effects from the impairments are not wholly supported.[103]

On December 24, 2015, Plaintiff requested a hearing before an ALJ.[104]  A disability report dated December 28, 2015, added no new information except that Plaintiff found it "very hard to do any physical activities" because of "dyslexia, memory and cognitive impairments, anxiety, depression, high blood pressure, and panic

---

[100]    See Tr. 124, 251.

[101]    Tr. 251.

[102]    See Tr. 104-14, 125-28.

[103]    Tr. 108 (emphasis omitted); see also Tr. 107, 109-11.

[104]    See Tr. 129-30.

attacks."[105]  A year, almost to the day, after that last disability report, the ALJ granted Plaintiff's request and scheduled the hearing on February 27, 2017.[106]

As of November 2016, Plaintiff was caring for two of her three grandchildren.[107]

## C.  **Hearing**

During the hearing, Plaintiff, a vocational expert, and a medical expert testified.[108]  Plaintiff was represented by an attorney.[109]  The attorney presented Plaintiff's theory of the case in which he acknowledged the "scantiness of the record" and suggested "fill[ing] in the gaps with testimony."[110]  The ALJ began the hearing by examining Plaintiff about her work history.[111] Plaintiff exhibited difficulty in answering questions and remembering information such as prior work duties and dates she last worked.[112]  When the ALJ asked Plaintiff for her address, Plaintiff read it from her driver's license.[113]  During questioning

---

[105]    Tr. 263; see also Tr. 258-62, 264-65.

[106]    See Tr. 146.

[107]    See Tr. 333.

[108]    See Tr. 72-93.

[109]    See Tr. 72, 74.

[110]    Tr. 76.

[111]    See Tr. 76-79.

[112]    See Tr. 78-79.

[113]    See Tr. 80.

by her attorney, Plaintiff did not provide audible, substantive answers, and the court order a five-minute recess.[114]

When the hearing reconvened, the ALJ began questioning the medical expert, Glenn Sternes, Ph.D., ("Dr. Sternes").[115]   In response to the request that he identify Plaintiff's medically determinable impairments, Dr. Sternes provided a summary of Dr. Muehe's evaluation and an appointment at MHMRA.[116]   Dr. Sternes identified Listings 12.02 for learning disorders and memory issues, 12.04 for depressive, bipolar, and related disorders, and 12.09 for alcohol abuse.[117]   Regarding the last of these, Dr. Sternes said that he needed more information concerning continuing alcohol abuse.[118]

The ALJ then asked Dr. Sternes to rate certain areas of mental limitation considered in all three of the identified Listings, to which Dr. Sternes opined that Plaintiff's degree of limitation for understanding, remembering, or applying information was moderate; her degree of limitation for interacting with others was mild to moderate; her degree of limitation for concentration, persistence, or maintaining pace was marked; and her degree of limitation for

---

[114]    See Tr. 81-82.

[115]    See Tr. 82.

[116]    See Tr. 83-84.

[117]    See Tr. 84.

[118]    See id.

adapting or managing herself was marked.[119]  Dr. Sternes concluded that Plaintiff met the criteria of Listing 12.04.[120]  During Dr. Sternes' testimony, Plaintiff blurted, "My daughter gave me a shower today."[121]

The ALJ asked Dr. Sternes if the removal of drugs or alcohol would result in an improvement in Plaintiff's symptoms, and he responded, "It's hard to say, Your Honor.  It really is.  I don't know whether abuse is continuing, if medications are being taken, a number of things would enter into that."[122]  He confirmed that the most recent note in the record was from 2015 and indicated that Plaintiff had been sober for six months.[123]

Byron Pettingill ("Mr. Pettingill"), vocational expert, classified Plaintiff's prior job as a beautician as skilled and customarily performed at the light exertional level, her prior job as a janitor as unskilled and customarily performed at the medium exertional level, and her job as a bus driver as semiskilled and customarily performed at medium exertional level.[124]  The ALJ described a hypothetical individual of the same age, education, and past work experience as Plaintiff who could "understand, remember

---

[119]    See Tr. 84-85.

[120]    See Tr. 85.

[121]    Id.

[122]    Tr. 85-86.

[123]    See Tr. 86.

[124]    See Tr. 87.

and carry out simple instructions, make simple decisions, interact with others, concentrate for extended periods and respond to changes."[125]  Mr. Pettingill opined that the hypothetical individual could perform Plaintiff's prior job as a janitor.[126]  He also identified three additional jobs available in the national economy that the hypothetical individual could perform: (1) laundry worker, unskilled at the medium exertional level; (2) office cleaner, unskilled at the light exertional level; and (3) final assembler, unskilled at the sedentary exertional level.[127]

When asked by Plaintiff's attorney to assume a hypothetical individual of the same age, education, and work experience as Plaintiff but unable to establish interpersonal relationships sufficient to have a working relationship with coworkers and unable to sustain attention and concentration for two hours, Mr. Pettingill confirmed that the individual would not be able to perform Plaintiff's past relevant work or any other alternative work in the national economy.[128]  During Mr. Pettingill's testimony, Plaintiff blurted, "I didn't recall what Ted was doing."[129]

Near the conclusion of the hearing, the ALJ returned briefly

---

[125]    Id.

[126]    See Tr. 88.

[127]    See Tr. 88-89.

[128]    See Tr. 89.

[129]    Tr. 87.

to questioning Plaintiff.[130]   The ALJ noted that Plaintiff had continued to work after the head-trauma injury twenty years earlier and asked Plaintiff what had happened recently that made her unable to continue working.[131]   Plaintiff responded, "I don't remember."[132] After that response, the ALJ attempted to conclude the hearing, but Plaintiff's attorney indicated that Plaintiff wanted to say something else.[133]   Plaintiff said, "My daughter give [sic] me a bath today."[134]   In response to the ALJ's followup questioning, Plaintiff stated that she and her daughter lived together and that her daughter normally helped with bathing because Plaintiff had fallen in the tub.[135]

Plaintiff continued, "[A] lot of times when I'm doing different stuff, they've got to make sure I use the right type of chemicals or anything to wash off because I'm allergic to a lot of stuff."[136]   The ALJ asked Plaintiff if there was any other information she would like the ALJ to consider.[137]   This colloquy transpired:

---

[130]    See Tr. 90.

[131]    See id.

[132]    Id.

[133]    See id.

[134]    Id.

[135]    See Tr. 91.

[136]    Id.

[137]    See id.

CLMT:     I don't know.  You're pretty.

ALJ:    Thank you.  So are you.    Appreciate it.
Anything you want me to consider as far as whether you
think you need to tell me if you can go back to work at
all?

CLMT:  I'm not sure if I can do it.

ALJ:  Okay.

CLMT:  I don't know.

ALJ:  Okay.  Well I do have your medical records.
Those have been exhibited.  I will consider the testimony
that I've been presented with today.[138]

## D.  **Commissioner's Decision**

On April 4, 2017, the ALJ issued an unfavorable decision.[139]
The ALJ found that Plaintiff had not engaged in substantial gainful
activity since November 27, 2014, the alleged onset date.[140]   The
ALJ recognized the following impairments as severe: "affective mood
disorder, learning disorder, alcohol abuse and obesity."[141]   She
identified no nonsevere impairments.[142]   Regarding obesity, the ALJ
stated that Plaintiff's Body Mass Index ("BMI") was in the obese
range.[143]   According to the ALJ, obese individuals "may have
limitations in any of the exertional or postural functions, in

---

[138]     See Tr. 91-92.

[139]     See Tr. 12-27.

[140]     See Tr. 17.

[141]     Id. (emphasis omitted).

[142]     See Tr. 17-18.

[143]     See Tr. 18.

[their] ability to manipulate objects, and in [their] tolerance of extreme heat, humidity, or hazards."[144]  The ALJ stated that she had considered the effects of Plaintiff's obesity when assessing her RFC.[145]

At the Listing step, the ALJ found that Plaintiff did not meet the requirements of any Listing specifically addressing Listings 12.02 and 12.04.[146]  The ALJ addressed Dr. Sternes' hearing testimony, stating:

> Dr. Sternes, a board certified psychologist, testified that the claimant has a mood disorder, a learning disorder and alcohol abuse.  Dr. Sternes testified that he considered Listings 12.02, 12.04 and 12.09.[147]  Dr. Sternes testified that the claimant would meet the [paragraphs] A & B criteria.  Dr. Sternes was of the further testimony [sic] that the claimant would meet Listing 12.04.  Dr. Sternes testified that it was hard to say if the claimant's symptoms would improve if alcohol was removed.  He is not sure if the alcohol abuse is continued but the evidence indicates that the claimant has been sober for six months.[148]

In deciding what weight to afford Dr. Sterne's testimony, the ALJ concluded:

> Dr. Sternes did not adequately take into account the claimant's alcohol abuse.  Dr. Sternes testified that he was not sure, if the claimant stopped abusing alcohol[,] that her symptoms would improve.  The fact that the

---

[144]    Id.

[145]    See id.

[146]    See Tr. 18-20.

[147]    Listing 12.09 is now reserved.  Previously, Listing 12.09 pertained to substance addiction disorders.

[148]    Tr. 19.

claimant is able to care for her two grandchildren indicates that she is able to concentrate and maintain persistence and pace. Therefore, little weight is given to Dr. Sternes'[] testimony.[149]

On her review of the Listings, the ALJ cited to Dr. Muehe's evaluation in support of the finding that Plaintiff's mental impairments did not meet paragraph B, which requires that they result in at least one extreme or two marked limitations.[150] The ALJ also determined that the evidence did not establish the paragraph C criteria.[151]

The ALJ found Plaintiff able to perform a "full range of work at all exertional levels but with some nonexertional limitations."[152] Specifically, the ALJ found Plaintiff capable of understanding, carrying out, and remembering simple instructions, making simple decisions, interacting with others, concentrating for extended periods, and responding to workplace changes.[153]

The ALJ outlined the two-step process for evaluating symptoms and employed it to conclude that Plaintiff did have underlying medical conditions that could cause Plaintiff's symptoms but found that the objective clinical findings did not support the degree of

---

[149]    Tr. 22.

[150]    See Tr. 19.

[151]    See id.

[152]    Tr. 20 (emphasis omitted).

[153]    See id.

limitation alleged.[154]    As an example, the ALJ contrasted Plaintiff's testimony "that she suffered from significant limitations" with her admission that she was not taking any prescribed medication.[155]  The ALJ continued:

> [The claimant] has not sought emergency room care on a frequent basis and has not been hospitalized for any duration for any condition since she alleged she became disabled.  The claimant has not received the type of mental health treatment one would expect for a totally disabled individual.  More specifically, in August 2016, she stated that she ha[d] not had any treatment in the last eight years.  In November 2016, she missed her appointment.[156]

While acknowledging that Plaintiff's described ADLs were fairly limited, the ALJ discounted the value of Plaintiff's allegations in showing disability because they could not be "objectively verified with any reasonable degree of certainty" and because, even if true, attributing the alleged degree of limitation to Plaintiff's medical condition was difficult in light of "the relatively weak medical evidence and other factors discussed in this decision."[157]  In fact, the ALJ noted, the record contained no "opinions from treating or examining physicians indicating that [Plaintiff was] disabled or even ha[d] limitations greater than

---

[154]    See Tr. 20, 22.

[155]    Tr. 21.

[156]    Id.; see also Tr. 22 (reiterating that the medical records lacked evidence of "repeated hospitalizations or aggressive forms of therapy that would be expected if [Plaintiff] experienced severe, persistent, unremitting symptoms").

[157]    Tr. 21; see also Tr. 22 (emphasizing that Plaintiff's lack of treatment during the relevant period was "a major issue").

those determined in this decision."[158] One "other factor" considered by the ALJ in deciding how limiting Plaintiff's symptoms were was that she cared for two of her grandchildren, which could be "quite demanding both mentally and physically."[159]

The ALJ also found Plaintiff's ability to pass a test to become a beautician and the lack of evidence indicating ongoing issues resulting from head trauma counted against the reliability of her subjective testimony regarding the degree of her limitations.[160] The ALJ acknowledged that Plaintiff wore mismatched shoes to the hearing but found that behavior inconsistent with evidence that Plaintiff's grooming habits were good.[161] The ALJ remarked that the "inconsistent information" provided by Plaintiff was not necessarily "the result of a conscious intention to mislead," but her testimony was unsupported by objective findings, not entirely consistent with the record, and exaggerated.[162]

The ALJ also discounted the value of the GAF score because, among other reasons, it is a subjective assessment at one point in time and offers little in assessing Plaintiff's level of functioning over the course of a year or more.[163] In contrast, the

---

[158] Tr. 21.

[159] Id.

[160] See Tr. 22.

[161] See id.

[162] Id.

[163] See Tr. 21.

ALJ found the medical consultants' RFC opinions that Plaintiff was capable of a range of unskilled work to be entitled to great weight.

The ALJ found, based on the vocational expert's testimony, that Plaintiff was able to perform her past relevant work as a janitor.[164]  Nevertheless, the ALJ considered whether Plaintiff was capable of performing other jobs in the national economy.[165]  The ALJ again relied on the vocational expert's opinion that an individual with Plaintiff's age, education, work experience, and RFC would be able to perform the jobs of office cleaner, laundry worker, and final assembler.[166]

Therefore, the ALJ found that Plaintiff was not disabled at any time from November 27, 2014, the alleged onset date, through April 4, 2017, the date of the ALJ's decision.[167]

On June 2, 2017, Plaintiff appealed the ALJ's decision.[168]  On March 6, 2018, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[169]  After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the

---

[164]     See Tr. 23.

[165]     See Tr. 23-24.

[166]     See Tr. 24.

[167]     See Tr. 16, 24.

[168]     See Tr. 183.

[169]     See Tr. 1-5.

decision by this court.[170]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision. <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

## A. <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act. <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any

---

[170]    <u>See</u> Tr. 1-3; <u>Hull v. Berryhill</u>, H-18-mc-1205, Doc. 1, Application to Proceed In Forma Pauperis Dated Apr. 23, 2018.

"substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B. **Substantial Evidence**

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, ____ U.S. ____, 139 S. Ct. 1148, 1154 (2019)(internal quotations marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Id. It only requires "more than a mere scintilla." Id.

The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained

in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. See Salmond v. Berryhill, 892 F.3d 812, 819 (5th Cir. 2018). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's decision contains the following errors:

[A.] The ALJ erred in failing to adopt the RFC recommended by the testifying [medical expert].

[B.] The RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence, as required by [Social Security Ruling ("SSR")] 96-8p.

[C.] While the ALJ concluded that plaintiff can perform past relevant work, the ALJ provided no specific findings or analysis regarding the physical and mental demands of this work, as required by SSR 82-62.

[D.] The ALJ failed to fulfill the duty imposed by SSR 82-62 to fully question plaintiff and develop the record regarding the physical and mental demands of plaintiff's past relevant work.

[E.] The ALJ's RFC is inconsistent with a finding of "severe" mental impairments resulting in "moderate limitations" in concentration, persistence and pace because the RFC does not contain the limitations normally associated with that level of impairment.[171]

The court addresses Plaintiff's arguments under broad headings of Listing 12.04 for depressive, bipolar, and related disorders, RFC, and Past Relevant Work. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

## A.  Listing 12.04 for Depressive, Bipolar, and Related Disorders

At the hearing the testifying medical expert opined that Plaintiff's depressive disorder met Listing 12.04. Plaintiff argues that the ALJ failed to "adequately articulate the rationale for failing to adopt" this opinion and erred in developing an RFC that contradicted the medical expert's opinion.[172]

The regulations clearly state that an ALJ is "not required to adopt any prior administrative medical findings" but must follow

---

[171]    Doc. 16, Pl.'s Reply to Def.'s Mot. for Summ. J. pp. 1-2. Plaintiff's motion also includes an argument that the ALJ failed to include any limitations related to the severe impairment of obesity. The court assumes that Plaintiff did not list that argument in her reply because she was no longer pursuing it. Nevertheless, the court notes that the ALJ identified potential limitations resulting from obesity and stated that she had considered the effects of obesity on Plaintiff. A diagnosis of obesity or even the ALJ's recognition of it as a severe impairment does not direct a finding of any or all of the possible limitations associated with obesity. The ALJ is tasked with determining which of the possible limitations apply to Plaintiff. In this case, substantial evidence supports the ALJ's decision not to include any of the limitations generally associated with obesity because the record contains absolutely no evidence that Plaintiff was limited in any way by her weight.

[172]    Doc. 14, Pl.'s Mot. for Summ. J. pp. 3-4.

the requirements of 20 C.F.R. §§ 404.1520b, 404.1520c, 404.1527 in considering, evaluating, and articulating findings on administrative medical findings. 20 C.F.R. § 404.1513a. Pertinent here, an ALJ need "not defer or give any specific evidentiary weight . . . to . . . prior administrative medical finding(s)" but must articulate the consideration of those findings and how persuasive the ALJ found them to be based on their supportability and consistency.[173] 20 C.F.R. § 404.1520c.

Plaintiff's contention that the ALJ failed to articulate her rationale for not adopting Dr. Sternes' opinion is plainly incorrect. In her decision, the ALJ recounted Dr. Sternes' opinion, noting that he expressed uncertainty whether Plaintiff had maintained sobriety or whether Plaintiff's symptoms would have improved absent substance abuse. Moreover, the ALJ discussed her weight assessment, addressing both supportability and consistency. On the former, the ALJ stated that Dr. Sternes' opinion did not adequately account for Plaintiff's alcohol abuse; on the latter,

_____

[173] Plaintiff does not base her argument on the relevant regulations cited here. Instead, she cites non-precedential case law that is not on point. Rohrberg v. Apfel, 26 F. Supp.2d 303, 311 (D. Mass. 1998), addresses the ALJ's obligations with regard to the weight given opinions of treating physicians and the ALJ's ignoring of medical reports in favor of determining RFC based on "bare medical findings. Kelly v. Chater, 952 F. Supp. 419, 426 (W.D. Tex. 1996) likewise offers little support to Plaintiff's position on Dr. Sternes' Listing determination. There, that court is also addressing the weighing of a treating physician's opinion but recognizes the ALJ's authority to determine the credibility of medical experts, a point that does not appear to support Plaintiff's position. See id. The quote Plaintiff presents from that case states that the ALJ must explain the reasons for rejecting any favorable evidence but cites a case in which the favorable evidence is subjective complaints not the opinion of a medical expert. See id. (citing Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994). Regardless, the ALJ did explain her reasons as discussed herein.

the ALJ cited Plaintiff's caring for her grandchildren as inconsistent with the limitations he imposed on Plaintiff's ability to concentrate and maintain persistence and pace.  Because the ALJ found Dr. Sternes' opinion entitled to little weight, she did not adopt it.

Moreover, evidence in the record provides substantial evidence in support of a finding that Plaintiff's mental impairments did not meet a Listing.  At Dr. Muehe's April 2015 evaluation, Plaintiff reported six months of sobriety.  But her treatment records from August 2016 to February 2017 reflect extensive alcohol usage, as well as cannabis usage.  During those six months, Plaintiff exhibited psychotic symptoms, which, on at least one documented occasion, manifested while she was intoxicated.  Additionally, even during the period of Plaintiff's manifestation of more severe symptomology and substance abuse, Plaintiff's treating physician assessed Plaintiff as having largely normal mental status examinations and found her capable of ADLs, social skills, and caring for her grandchildren, which are activities that are inconsistent with Listing-level depression.  Finally, the reviewing medical consultants at the initial and reconsideration levels both found, in September 2015 and December 2015, that Plaintiff's impairments did not meet any Listing.

For these reasons, the court agrees that Dr. Sternes' opinion that Plaintiff met Listing 12.04 is not supported by and is

inconsistent with the administrative record.

**B.  RFC**

Plaintiff contends that the ALJ's RFC assessment is conclusory and lacks both rationale and references to the evidence.  In a related argument, Plaintiff argues that the ALJ failed to include limitations related to concentrating, persisting, or maintaining pace even though she found Plaintiff moderately limited in that area.

An individual's RFC is her utmost remaining ability to work despite all of the limitations resulting from her impairment.  <u>See</u> 20 C.F.R. § 404.1545(a); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1023 (5th Cir. 1990).  In evaluating the RFC, the ALJ is directed by the regulations to consider how the individual's impairments affect her physical, mental, and other abilities, as well as the total limiting effects of her impairment.  <u>See</u> 20 C.F.R. § 404.1545(b)-(e).

The ALJ is required to perform and discuss a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." <u>Myers v. Apfel</u>, 238 F.3d 617, 620 (5th Cir. 2001)(quoting SSR 96-8p, 1996 WL 374184, at *1).  An individual must show that she is "so functionally impaired" by the condition that she is precluded from engaging in any substantial gainful activity.  <u>Hames v. Heckler</u>, 707 F.2d 162, 165 (5th Cir.

1983).  The court must give deference to the ALJ's evaluation of the plaintiff's subjective complaints if supported by substantial record evidence.  See Villa, 895 F.2d at 1024.  The ultimate responsibility for determining the individual's RFC lies with the ALJ.  20 C.F.R. § 404.1527(d)(2); Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).

Plaintiff claimed disability as of November 27, 2014.  There was no medical evidence of Plaintiff's condition from that date until April 2015 when Dr. Muehe performed a comprehensive evaluation.  That evaluation was the only medical record addressing Plaintiff's condition in 2015.  Dr. Muehe clearly found Plaintiff capable of work limited to operating simple equipment, with ample time and instruction, limited number of steps, access to a supervisor, and experiential training.  Dr. Muehe did not indicate any greater limitations to accommodate difficulties with concentration, persistence, and pace.

The only other medical records were from a six-month period of treatment at MHMRA beginning in the latter half of 2016 through the first two months of 2017.  During the short period of treatment at MHMRA, Plaintiff missed multiple appointments, was noncompliant with medications, and continued to abuse alcohol and cannabis.  Even so, Plaintiff only briefly exhibited psychotic symptoms, an insufficient period of time to qualify longitudinally for disability.

The record contained a function report from September 2015 and an update from December 2015. The former listed high-level functionality based on self-reported ADLs, including preparing meals, attending church, caring for her grandchildren, performing household chores, and completing tasks without reminders. The latter simply stated that her condition had worsened. Plaintiff's hearing testimony provided no useful information about her condition. Two medical consultants reviewed the record and found her not disabled.

Given the "scantiness of the record," the ALJ appropriately relied significantly on the absence of medical treatment and Plaintiff's reports of her ADLs. The ALJ addressed all of the medical and other evidence in the record. She satisfied the discussion requirements to the extend she could with the limited evidence. She specifically found the Plaintiff's caregiving for her grandchildren belied limitations in Plaintiff's ability to concentrate and to maintain persistence and pace.

The ALJ satisfied all of her obligations with regard to weighing the evidence and determining Plaintiff's RFC and was entitled to rely on the vocational expert's responses to the ALJ's hypothetical questions concerning jobs that Plaintiff could perform.

C.  **Past Relevant Work**

Plaintiff challenges the ALJ's determination that Plaintiff

could perform her past relevant work as a janitor on the basis that the ALJ failed to provide specific findings or analysis regarding the demands of the work and failed to fully question Plaintiff and develop the record with regard to those demands.

The ALJ's responsibility at step four is to determine whether the claimant's impairments would prevent her from doing past relevant work. See 20 C.F.R. § 404.1520(e). The ALJ should reach this determination by comparing the claimant's RFC with the physical and mental demands of her past work. See id. To determine the physical and mental demands of past work, the SSA will ask the claimant for information about that work. See 20 C.F.R. § 404.1560(b)(2). The SSA may also rely on information from a vocational expert. See id. The claimant bears the burden of demonstrating that she is unable to perform her past relevant work. See Brown v. Astrue, 344 F. App'x 16, 19 (5th Cir. 2009)(unpublished).

Here, the ALJ determined Plaintiff's RFC and found that the job of janitor did not require any work-related activities precluded by her RFC. In the hearing, the ALJ attempted to elicit information from Plaintiff about her past relevant work, but Plaintiff exhibited an inability to recall any helpful information. The ALJ pursued the line of questioning until its futility was apparent. The record contained job histories that listed the position of janitor but Plaintiff failed to provide information on

38

the mental and physical demands of the janitorial position as performed by Plaintiff. The ALJ, therefore relied on the hearing testimony of the vocational expert, who was familiar with the demands of that position as usually performed.

Even if the ALJ made any procedural error in the Step Four assessment, which the court explicitly does not find, the error was harmless because the ALJ proceeded to Step Five and found that Plaintiff could perform other jobs available in the national and regional economies. See Taylor, 706 F.3d at 603 ("[P]rocedural perfection is not required unless if affects the substantial rights of a party."). The ALJ properly found that Plaintiff was not disabled at any time from November 27, 2014, through April 4, 2017.

## IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

**SIGNED** in Houston, Texas, this 30th day of September, 2019.

_____
Nancy K. Johnson
United States Magistrate Judge